Argued and submitted November 24, 1980,
reversed and remanded April 13,
petitioner's reconsideration and respondent Baza'r, Inc.'s
reconsideration denied May 21,
petitions for review allowed June 23, 1981 (291 Or 151)

In the Matter of the Compensation of
Sharon Bracke, Claimant.

BRACKE,
*Petitioner - Cross-Respondent,*

*v.*

BAZA'R, INC.,
*Respondent - Cross-Petitioner,*
ALBERTSON'S FOOD CENTERS et al,
*Respondents.*

(No. 77-6938, CA 17587)

626 P2d 918

Charles Bates, Portland, argued the cause for petitioner - cross-respondent. On the brief was Parker & McCann, Portland.

Mildred J. Carmack and Scott M. Kelley, Portland, argued the cause for respondent - cross-petitioner and respondent General Adjustment Bureau. With them on the briefs were Cheney & Kelley, and Ridgway K. Foley, Jr., and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Margaret H. Leek Lieberan, Portland, argued the cause for respondent Albertson's Food Centers. With her on the brief was Lang, Klein, Wolf, Smith, Griffith & Hallmark. Portland.

Richard William Davis, Portland, argued the cause for respondent O.J.'s 42nd Avenue Thriftway. With him on the brief was Lindsay, Hart, Neil & Weigler, Portland.

Charles R. Holloway, III, Portland, argued the cause for respondent Aetna Insurance Company. With him on the brief was Tooze, Kerr, Peterson, Marshall & Shenker, Portland.

G. Howard Cliff, Portland, argued the cause for respondent Industrial Indemnity Company. With him on the brief was B. Anderson Gunter, Certified Law Student, Portland.

Before Richardson, Presiding Judge, and Thornton and Buttler, Judges.

BUTTLER, J.

## BUTTLER, J.

Claimant appeals from an order of the Workers' Compensation Board affirming and adopting the opinion and order of the referee. That order concluded that claimant suffered from a compensable occupational disease and that under the last injurious exposure rule claimant's last employer would be responsible for providing the compensation, but that the claim was unenforceable because claimant had not requested a hearing within 60 days of that employer's denial of her claim and had not shown good cause for her failure to do so. Baza'r, Inc. cross-appeals, contending that the evidence does not support the finding that claimant suffers from a compensable occupational disease. We reverse and remand to the Board for further proceedings.

Claimant filed claims for an occupational disease, colloquially referred to as "meat wrappers' asthma," against three of her former employers, Baza'r, Inc., Albertson's and Thriftway. Each of the claims was denied, and claimant made a timely request for hearing with respect to the denial by Baza'r; her request for hearing with respect to the denial by Thriftway was made more than 60 days following the denial, but within the 180-day period permitted if good cause is shown. The referee and Board concluded that the request for hearing on Thriftway's denial was not timely. Because of our disposition of the case, we do not reach that question.

Claimant began working as a meat wrapper for Baza'r in May of 1974 and, for the most part, worked full time for 16 months thereafter. From September 28, 1975, until August 9, 1976, she was off work most of the time, but commencing on the latter date she worked full time for five weeks and then began working one or two days a week through March 30, 1977, except for a two month period from mid-October to mid-December, 1976. She worked for Baza'r a total of 2,650 hours.

Beginning on January 18, 1977, and continuing to May 9, 1977, she worked part-time for Albertson's, also as a meat wrapper, during which time she worked a total of 188 hours. During that same period, claimant also worked as a

meat wrapper part-time for Thriftway, being employed a total of 266 hours from February 14, 1977, to May 14, 1977, the last day she worked as a meat wrapper. Thereafter the three claims involved herein were filed.

There is no real dispute that claimant suffers from some sort of asthmatic condition. There is, however, a vigorous dispute as to whether that condition is compensable (*i.e.,* work related), and, in particular, whether claimant suffers from "meat wrappers' asthma," and, if so, which of the three employers, if any, is responsible and which insurer is on the risk. The underlying questions of whether claimant suffers from "meat wrappers' asthma" and the nature and attributes of that disease are medical questions, and there is an abundance of medical evidence.

The record discloses that meat is wrapped in polyvinyl chloride (PVC), and that when it is cut with a hot wire, hydrochloric acid and other fumes are produced. When working with price labels, a worker is exposed to thallic anhydride. There is evidence that these substances contribute to the condition known as "meat wrappers' asthma," which condition has not been generally recognized as a distinct medical condition until recently. Dr. Bardana described that condition as follows:

> "Meat wrappers' asthma is a form of reactive airway disease, twitchy lungs, if you wish, which develop de nova *[sic]* during exposure by a worker to the emanations *[sic]* of polyvinyl chloride wrap and/or price label adhesive fumes, which usually come on over a period of time after exposure and becomes acute and may remain for a long period of years before it is discovered and may leave permanent damage to the lungs if the exposure is undetected or if the disease is undetected and the patient remains in the environment for long periods of time."

Before working as a meat wrapper, claimant testified that she had no pulmonary problems, other than those apparently related to colds which had settled in her bronchial tubes. She said that when she started working as a meat wrapper she developed more symptoms, but felt better when she was not working. In particular, she testified that when she was off work for about a year during the years 1975 and 1976 she felt like her lungs opened up,

but when she returned to work her symptoms reoccurred. Although her testimony in this respect is disputed, the record discloses that for at least six months during that period she did not visit a doctor and that when she did visit a doctor it was for an unrelated condition.

While working at Baza'r, claimant cut the PVC with a hot wire and also worked with price labels; at Albertson's she cut PVC with a hot wire, but did not work with price labels and, she said, there was good ventilation; at Thriftway she did the same thing she did at Baza'r, but the ceiling was lower, making the working conditions at Thriftway the least desirable of the three mentioned.

The record, which includes medical records going back to March of 1973, does not disclose that claimant complained specifically of her working conditions, or exposure to fumes at work, as a factor in her physical or emotional conditions prior to July of 1977, when she consulted Dr. Sample, a pulmonary specialist, concerning the possibility that she was suffering from the meat wrappers' syndrome. After conducting some pulmonary tests, Dr. Sample was of the opinion that claimant's symptoms were not related to her occupation.

Between August 16, 1977, and October 10, 1977, claimant consulted Dr. Garges, an allergist, who administered controlled exposure tests to PVC fumes under the supervision of an internist, Dr. Lawyer. Those two doctors concluded that claimant had, in fact, "developed a bronchospastic condition that responds to a certain degree to avoidance of chemical irritants including polyvinyl chloride and cigarette smoke although there may be other triggers that have as yet not been identified." They concluded that they could not say whether polyvinyl chloride had acted in terms of an allergen or whether it was purely an irritant. Their report pointed out that claimant had a background of allergic reaction, but that the intradermal skin tests administered to her determined that she had no reactions except to plantain pollen, which, they said, did not "correlate clinically * * *." They did not conduct tests to determine claimant's reaction to thallic anhydride produced by price labels.

During this period, claimant filed claims against both Thriftway and Albertson's; Thriftway denied the claim against it on July 18, 1977, and Albertson's denied the claim against it on October 20, 1977. On November 10, 1977, claimant filed a request for hearing on both of those denials. On December 28, 1977, claimant signed a Notice of Occupational Injury or Disease Report with respect to her employment at Baza'r, but the employer indicated it first became aware of the claim on January 7, 1978. There were two denials of the claim by Baza'r, one on March 3, and the other on March 6, 1978, by different insurers of the employer covering different periods of time. Timely request was made for a hearing on both Baza'r denials, at which time it was requested that all of the denied claims be consolidated.

On September 13, 1978, claimant was examined by Dr. Bardana, an allergist, who is the head of the allergy section of the University of Oregon Health Science Center. Dr. Bardana is the only one of the medical experts who has done research relating to the so-called meat wrappers' asthma, and he has published some papers and written a chapter in a textbook on this occupational disease. He testified that the disease was "rather rare, had not been widely written about, but began to be accepted by the sub-specialty in the early part of 1976 * * *" and that "* * * dissemination of knowledge to the general practitioners was just beginning." In particular, he said that the harm caused by thallic anhydride from price labels, and the possibility that those fumes may be more harmful than those from PVC, was not recognized until 1977.

It was Dr. Bardana's opinion that claimant suffered from "meat wrappers' asthma." All of the respondents attack Dr. Bardana's testimony on the ground that he did not have a complete medical history of claimant prior to the time he rendered his opinion. Prior to testifying, however, the doctor reviewed all of the medical evidence in the record, which goes back to 1973, and he was cross-examined extensively on that evidence. He testified that there was nothing in the medical history which was inconsistent with his opinion, which he continued to hold: claimant, to a reasonable medical probability, had contracted the occupational disease commonly known as "meat wrappers' asthma."

None of the respondents produced an expert witness to contradict Dr. Bardana. They rely on the opinions of Drs. Sample, Garges and Lawyer. But their opinions do not clearly contradict Dr. Bardana; rather they indicate a lack of certainty as to the cause of claimant's problems. As Dr. Bardana noted, Drs. Garges and Lawyer did not test claimant's reaction to thallic anhydride produced by price labels, and that substance is now thought to be more harmful than PVC.

■    On this record, we conclude, as did the referee and the Board, that claimant has established by a preponderance of the evidence that she contracted an occupational disease as a result of her employment as a meat wrapper.

The question remains as to which of the three employers is responsible for compensation. The answer depends upon whether the last injurious exposure rule controls; claimant was last exposed to the injurious fumes while employed at Thriftway, albeit for only a short time.[1] Both the referee and the Board reached the conclusion that the rule applied and that Thriftway was the responsible employer, but that claimant's request for a hearing on Thriftway's denial was not timely.

We adopted the last injurious exposure rule in *Mathis v. SAIF,* 10 Or App 139, 499 P2d 1331 (1972). In that case, we held that where an occupational disease is caused by a succession of jobs, each of which exposes the claimant to conditions which could cause the disease, then the last employer with risk exposure is liable for compensation, even though that employment was of short duration. We pointed out that the purpose in adopting the rule was to free the claimant from the burden of assigning or allocating responsibility where it was difficult or impossible to determine which of the similar employments caused the disease resulting in later disability.

In *Holden v. Willamette Industries,* 28 Or App 613, 560 P2d 298 (1977), we applied the rule in a manner which

---

[1] Because of our disposition of the case, we need not consider the possible consequences of the apparent simultaneous employment of claimant by Albertson's and Thriftway. *See Colwell v. Trotman,* 47 Or App 855, 615 P2d 1094 (1980).

defeated the worker's compensation claim, stating that the rule works both ways. We now question whether that is possible. The worker there suffered hearing loss while employed for Wimer, a subsidiary of Willamette Industries, for whom he worked from 1965 until mid-1970. In the spring of 1970, Wimer muffled its machinery and issued earplugs to its employes, and claimant testified that these measures were effective and that he noticed no depreciation in his hearing thereafter. He then worked for Weyerhaeuser Lumber Company from August, 1970, until April, 1971. That employer did not employ the precautions Wimer had adopted to reduce noise and noise perception. Thereafter, claimant returned to work for Wimer and filed the claim in question in July of 1973. Claimant testified that the working conditions at Wimer and Weyerhaeuser were the same; if that were true literally, then Wimer was the responsible employer — it was the last. Apparently, we concluded that the conditions were the same *except* for the precautions adopted by Wimer which made claimant's last employment with that employer noninjurious. We held that there was no way to determine whether claimant's condition had stabilized by the time of Wimer's precautions in early 1970, or whether it deteriorated further as a result of the noise exposure at Weyerhaeuser. On that record, we held that the last injurious exposure rule required that the responsible employer be Weyerhaeuser, against whom no claim had been filed.

Here, we are not confronted with the problem which was presented in *Holden.* Dr. Bardana testified that claimant probably became sensitized somewhere between April, 1974, and September or October of 1974, although he could not pick out a day or a month. It was clear, however, he said, that she had become sensitized no later than by mid-1975. It was during this period that claimant worked for Baza'r. Further, the doctor testified that once she became sensitized, she was sensitized for life.

He drew an analogy to a patient who was administered penicillin successfully 202 times throughout his life for various infections, but on the 203rd administration he has an allergic reaction to the penicillin. From that point on, he said, the patient is unable to tolerate penicillin. With

respect to claimant here, Dr. Bardana stated that once she became sensitized to the PVC or the thallic anhydride from price labels, exposure to those substances would produce symptoms, but would not worsen the underlying sensitization which she had already acquired.

Accordingly, even though claimant's working conditions at Albertson's and Thriftway were of a nature which could have caused the disease, the evidence in this case is that the disease had already been contracted prior to her employment for those employers. In this sense, the situation is analogous to the claim dealt with in *Weller v. Union Carbide*, 288 Or 27, 602 P2d 259 (1979), where the court held that in order to sustain a claim involving a preexisting condition it was necessary for claimant to show that the underlying condition had worsened. On the record in this case, if claimant had filed claims only against Albertson's and Thriftway the claims would fail if *Weller* were applied blindly; all she has shown is that she had symptoms brought about by the working conditions provided by those two employers, but the underlying preexisting condition had not changed. If such claims would fail, it would seem to be anomalous to apply the last injurious exposure rule with respect to them.

Although it may appear at first blush that the last injurious exposure rule and the *Weller* rule clash, we think they may be harmonized. In *Weller,* it was acknowledged that claimant was suffering from a non-work-related condition prior to the onset of the on-the-job symptoms for which he filed the claim in question. There was no issue as to which of several employers was responsible: the issue was whether a worsening of the symptoms not produced by a concomitant worsening of the underlying disease process was compensable. The court held it was not.

However, where, as here, the question is not one of compensability but, rather, which of several employers is responsible, the problem is whether the claimant must assume all of the risk of choosing the employer who the evidence ultimately will show is responsible, in fact, for the compensable condition. In *Mathis,* we held that a claimant was not required to assume that risk, but could make a claim against the last employer where working conditions

could cause the disease or injury. *Mathis* was not intended to limit the claimant to the last employer with risk exposure. Where the *claimant* is able to prove by a preponderance of the evidence that a prior employer was responsible in fact, the claim may be validly asserted against that prior employer and it is no defense that a subsequent employer exposed claimant to the same kind of risk if that risk was not injurious in fact.

We do not understand *Weller* to have changed any aspect of the last injurious exposure rule: the *Weller* rule applies only where claimant has an acknowledged preexisting condition, or condition which has been previously determined administratively or judicially to exist. In other words, if claimant here had filed her claim only against Thriftway and her evidence established only that her working conditions with that employer could have caused her disease, Thriftway would not be permitted to avoid responsibility by showing that the condition had stabilized during a previous employment and was not worsened by her employment at Thriftway.[2] *Weller* was not intended to present that dilemma; it would, however, preclude recovery against Thriftway if claimant had previously established her compensable disease in a claim against Baza'r.

As we said earlier, we question the correctness of our statement in *Holden* that the last injurious exposure rule works both ways. It is apparent that it cannot work both ways if it is to perform its intended function: if the last employer, against whom the claim is filed, may show that claimant's disease or injury was, in fact, caused during an earlier employment, the rule ceases to function as we enunciated it in *Mathis*. To the extent that *Holden* may be construed to permit that use of the rule, it is disapproved.

■ We hold, therefore, that the last injurious exposure rule does not prevent claimant from holding Baza'r responsible: she established that the compensable occupational disease was contracted while she was employed by Baza'r, and her later employment produced only symptoms (*i.e.,* was not injurious in fact).

---

[2] *See* n 1, *supra.*

We are unable to determine from the record which insurer, if any, is responsible on the risk, or whether Baza'r was self-insured during the critical time period. We conclude that claimant probably became permanently sensitized no earlier than October, 1974, and no later than mid-1975. The record discloses an apparent overlap during that period; Granite State Insurance Company (not a party hereto) provided coverage from August 1, 1974, until May 22, 1975; however, the record reveals that Baza'r was self-insured from October 1, 1974, to August 9, 1976. This discrepancy must be resolved on remand.

Reversed and remanded.