Lawrence and Linda LONGMORE, Individually, and as parents and natural guardians of David Ronald Longmore, Plaintiffs,

v.

MERRELL DOW PHARMACEUTICALS, INC., et al., Defendants.

Civ. No. 84–4071.

United States District Court, D. Idaho.

May 15, 1990.

Barry J. Nace, Bethesda, Md., for plaintiffs.

Jeffery J. Carlson and George Berry, Dixon, Carlson & Campillo, Santa Monica, Cal., for defendants.

## MEMORANDUM DECISION

CALLISTER, Senior District Judge.

The Court has before it defendants' motions for summary judgment. The Court has heard oral argument and the motions have been fully briefed. The Court must determine if there are any genuine issues of material fact. *See* Fed.R.Civ.P. 56(c).

In this product liability action, the plaintiffs claim that their child's birth defects were caused by the mother's use of Bendectin during her pregnancy. She took the drug to combat the nauseous effects of morning sickness. The child, David Ronald Longmore, was born with Poland's Syndrome, a condition that leaves him without a chest muscle on the right side and with a shortening and webbing of his fingers on his right hand. David's mother and father filed this action individually and on behalf of David, claiming that the Bendectin caused David's birth defects.

The defendants have filed motions for summary judgment pointing to more than thirty-five human epidemiological studies finding no causal connection between Bendectin and birth defects. In response, the plaintiffs' experts will criticize these studies and use chemical analysis along with various types of animal studies to conclude that Bendectin could cause birth defects.

Resolution of the summary judgment motions appears simple: the battling experts make summary judgment inappropriate. But the matter is complicated by three circuit courts that have found the plaintiffs' causation evidence insufficient as a matter of law in similar Bendectin litigation. *Ealy v. Richardson–Merrell, Inc.,* 897 F.2d 1159 (D.C.Cir.1990); *Brock v. Merrell–Dow Pharmaceuticals, Inc.,* 874 F.2d 307 (5th Cir.) *modified* 884 F.2d 166 (5th Cir.), *reh'g denied,* 884 F.2d 167 (en banc), *cert. denied* —— U.S. ——, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990); *Lynch v. Merrell–National Laboratories, Inc.,* 830 F.2d 1190 (1st Cir.).

The *Ealy* decision is representative and the most recent decision of these three cases. There, the D.C. Circuit, relying on the earlier case of *Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823 (D.C.Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989), held that testimony of the plaintiffs' experts concerning three types of scientific studies was inadmissible under Federal Rule of Evidence 703:

> These three types of studies then—chemical, in vitro [test tube], and in vivo [animal]—cannot furnish a sufficient foundation for a conclusion that Bendectin caused the birth defects at issue in this case. Studies of this kind, singly or in combination, are not capable of proving causation in human beings *in the face of the overwhelming body of contradictory epidemiological evidence.* Perhaps mindful of this, the last type of evidence considered by Dr. Done consisted of the epidemiological studies. *When such studies are available and relevant, and particularly when they are numerous and span a significant period of time,* they assume a very important role in determinations of questions of causation.

897 F.2d at 1161 (emphasis added) (quoting from *Richardson v. Richardson–Merrell, Inc., supra* at 830).

> The *Ealy* court then went on to hold that [t]herefore, under Rule 703, an opinion refuting this scientific consensus [the epidemiological studies] is inadmissible for lack of an adequate foundation, in the absence of other substantial probative

evidence on which to base this opinion. It is this uncontroversial rule of evidence that is that *ratio decidendi* of *Richardson* and this case.

In the other two cases cited above, *Lynch* and *Brock*, the First and Fifth Circuits reached similar decisions. No Ninth Circuit case has yet come down addressing these issues. The Court is therefore faced with persuasive but not binding precedent. The three circuit decisions placed considerable emphasis on the epidemiological evidence, and the Court will begin its inquiry there.

For obvious reasons, scientists do not investigate the potential toxic effects of a drug by performing tests on human beings. Instead, scientific investigators must use an indirect route and extrapolate their results. Animal studies, epidemiology, chemical analysis, clinical studies, and other analytical tools are all part of the investigative process. The three circuit decisions were particularly impressed with epidemiology which is the statistical study of disease in human populations. Dore, *A Commentary on the Use of Epidemiological Evidence in Demonstrating Cause–In–Fact*, 7 Harv.Envtl.L.Rev. 429 (1983). By studying large groups of people, epidemiologists can determine the association between exposure to a chemical and disease. For example, epidemiological studies have concluded that exposure to vinyl chloride in the workplace is associated with an increased incidence of cancer in rubber workers. Hall & Silbergeld, *Reappraising Epidemiology: A Response to Mr. Dore*, 7 Harv.Envtl.L.Rev. 441 (1983). As another example, prenatal exposure to seed treated with methyl mercury is associated with birth defects in children. *Id.*

As these examples show, epidemiological studies "are general in that they deal with sources of diseases and groups of people rather than particular individuals." Dore, *supra* at 436. In the context of a civil trial, epidemiological studies could be used to show that a defendant's conduct increased the plaintiff's risk of injury but "could not answer the critical question whether the defendant's conduct actually injured the plaintiff." Dore, *supra* at 436.

It is also important that an epidemiological association usually requires a 95% level of confidence.[1] To explain this using a hypothetical example, assume an epidemiologist observed an increased incidence of Poland's Syndrome among babies born to mothers who had ingested Bendectin during pregnancy. Using a 95% confidence level, the epidemiologist will conclude that ingestion of Bendectin during pregnancy is associated with an increased incidence of Poland's Syndrome only where the probability is one in twenty—or less—that the observation of association resulted from random chance. If the probability is one in nineteen that the events occurred by chance, the association will be deemed "statistically insignificant." Thus, an epidemiologist would find the correlation between Poland's Syndrome and Bendectin ingestion "insignificant" even though the probability is 94.73% (eighteen out of nineteen) that the observed relationship is not related to random chance. It is therefore apparent that the scientific standard for determining causation is much stricter than the standard employed in this Court. While the epidemiologist may conclude that the observed association is insignificant, the "certainty that the observed increase is related to its hypothetical cause rather than mere chance is still far more likely than not." *Allen v. United States*, 588 F.Supp. 247 (D.Utah 1984), *rev'd on other grounds* 816 F.2d 1417 (10th Cir.1987). As the Eleventh Circuit has recognized, "a distinction exists between legal sufficiency and scientific certainty." *Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d 741, 745 (11th Cir.1986). That distinction is vitally important in this case, as the following discussion will show.

The standard for determining causation in this Court is drawn from Idaho law. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In Idaho, proximate cause is a factual question normally reserved for the jury. *Stephens v. Stearns*, 106 Idaho 249, 678 P.2d 41 (1984). With regard to the factual ques-

---

1. In the study of epidemiology, confidence levels of 95%, 90%, "or occasionally 80% are most commonly used." Rothman, *Modern Epidemiology* at p. 119 (1986).

tion of causation, the plaintiff need only prove that it is more probably true than not that the mother's ingestion of Bendectin caused David's Poland's Syndrome. *Earl v. Cryovac, A Div. of W.R. Grace,* 115 Idaho 1087, 772 P.2d 725 (Idaho Ct.App. 1989); Idaho Standard Jury Instruction No. 112. This certainly does not require a confidence level of 95%, 90% or even 80%. A cause-and-effect relationship may be deemed insignificant under stringent scientific standards, but nevertheless establish causation under legal standards. This very point has been considered by the Idaho courts:

> Accordingly, when the courts apply medical and scientific evidence to a question of causation, they must interpret the evidence carefully in light of the applicable standard. They may not assume that a causal relationship is probable merely because a physician deems it significant in his diagnosis and treatment of a patient's condition. *Neither may they assume that a causal relationship is improbable merely because it has not been documented in a body of research literature where a high degree of certainty is demanded.*

*Earl v. Cryovac, A Div. of W.R. Grace, supra* at 1089–1090, 772 P.2d at 727–728 (emphasis added).

This Court does not mean to imply that epidemiological studies are without worth in proving causation. Certainly they play an important role. Hall & Silbergeld, *supra.* A jury might find the studies conclusive. But this Court cannot—at this stage of the case—find the epidemiological evidence "overwhelming." The studies are not designed to definitively prove individual causation, and they could label a cause "insignificant" that the legal system would find significant. As the Ninth Circuit has recognized, epidemiological studies are subject to error. *Asarco, Inc. v. Occupational Safety & Health Admin.,* 746 F.2d 483, 493, n. 19 (9th Cir.1984). These factors combine to dilute the power of the studies in this summary judgment proceeding.

The *Ealy* case used Federal Rule of Evidence 703 to preclude the plaintiffs' experts from discussing animal or chemical studies because of the "overwhelming" nature of the epidemiological evidence. Rule 703 requires that the grounds relied on by an expert be of "a type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject." In this case, there is no attack in the pending motions on the qualifications of plaintiffs' experts. The defendants simply want to use the overwhelming nature of the epidemiological studies to bulldoze aside the plaintiffs' experts. Once the epidemiological evidence is stripped of its "overwhelming" label, does Rule 703 still preclude plaintiffs' expert testimony? Only if animal studies and chemical analysis are not reasonably relied upon by experts who attempt to investigate the connection between drugs and birth defects. And the Court cannot make such a finding on the basis of the record before it. As stated by Federal District Court Judge Louis H. Pollak in *Villari v. Terminix Intern., Inc.,* 692 F.Supp. 568, 570 (E.D.Pa. 1988):

> While it may be true that the defendant can offer tests and experiments that do not support the findings of plaintiffs' experts, the defendant cannot deny that animal studies are routinely relied upon by the scientific community in assessing the carcinogenic effects of chemicals on humans. Even the defendant's own expert acknowledges that animal experiment studies are based on "prudent presumptions," although he concludes that they should not be admitted.

This statement is echoed in Axline, *Navigating the Toxic Bywaters of the Industrial Age,* 25 Idaho L.Rev. 459, 460 (1989):

> The scientific community has traditionally performed studies on laboratory animals and drawn conclusions from those studies about the potential health effects of toxic substances on humans. Although there are critics of this use of animal studies, the methodology is widely accepted in the scientific and regulatory communities, and is generally regarded as the best approach to testing for risk short of experimenting on humans.

There are certainly many valid criticisms of the use of animal studies. *E.g.,* Landau & O'Riordan, *Of Mice and Men: The Ad-*

missibility of Animal Studies to Prove Causation in Toxic Tort Litigation, 25 Idaho L.Rev. 521 (1989). The Court is not precluding the defendants from challenging during trial the admissibility of any particular animal studies. But such specific questions are not before the Court at this time. Animal studies are generally relied upon by experts determining the link between a drug and birth defects and the same is true for chemical analysis. While the Court will leave open the question of the admissibility of particular studies during the trial of this matter, the Court cannot now preclude all such studies under Rule 703.

There has been a great deal of general discussion that the plaintiffs' experts will mislead the jury. Rule 703 is subject to a Rule 403 analysis balancing probative value against the dangers of prejudice and confusion. 3 WEINSTEIN'S Evidence ¶ 703[03], at p. 703–31 (1988). The Court will certainly take a hard look at the expert testimony during trial. But as a general matter, the Court cannot state at this point that the expert testimony is precluded under Rule 403. In other Bendectin cases where the plaintiffs have used these very same experts, the juries—including an Idaho jury—have ruled that no causation exists between Bendectin and birth defects. See Cosgrove v. Merrell–Dow Pharmaceuticals, Inc., 117 Idaho 470, 788 P.2d 1293 (1989); In re Bendectin Litigation, 857 F.2d 290 (6th Cir.1988); see generally, Wilson v. Merrell–Dow Pharmaceuticals, Inc., 893 F.2d 1149 (10th Cir.1990) (general jury verdict for defendants). Obviously, the experts are not achieving complete success in bamboozling juries, even assuming that is their goal.

To the extent that the decisions of the three circuit courts discussed earlier can be interpreted to require summary judgment in this case, such would be extraordinary and unprecedented. This Court cannot find at this stage of the proceedings that no causation exists as a matter of law: The experts have lined up on both sides; there are many questions concerning the scientific studies proffered by both parties; and the Idaho law provides that summary judgment on causation is normally inappropri-

ate. Since the three circuit decisions have come down, federal district courts have gone both directions on defendants' motions for summary judgment. Compare, Koller v. Richardson–Merrell, Inc., Case No. 80–1258 (D.C.1989), (granting defendants' motions for summary judgment) with Wilson v. Merrell–Dow, Case No. 82–C–710–E (March 2, 1990, N.D.Okla.) (denying defendants' motions for summary judgment).

When the three circuit decisions are read carefully, they evidence a profound frustration with hired-gun experts. This Court shares those frustrations. The Court will examine very carefully the expert testimony that is proffered in this case by both sides. Nothing in this opinion is to be construed to preclude either side from making specific challenges to evidentiary matters. The Court is simply holding that it cannot at this stage of the proceedings adopt a general rule precluding all testimony of plaintiffs' experts. The Court shall therefore deny the motions for summary judgment filed by defendants.