John DOE, Plaintiff,

v.

CUTTER BIOLOGICAL, A DIVISION OF MILES, INC.; Miles Inc.; Miles Laboratories, Inc.; and Armour Pharmaceutical Corporation; Defendants.

Civ. No. 92–0434–S–HLR.

United States District Court,
D. Idaho.

May 12, 1994.

Robert Huntley, Stephanie Westermeier, Judson B. Montgomery, Givens Pursley Webb & Huntley, Boise, ID, Charles R. Kozak, Kaneohe, HI, for plaintiff.

Richard E. Hall, John J. Burke, Hall Farley Oberrecht & Blanton, Boise, ID, Dexter Louis, Duncan Barr, O'Connor Cohn Dillon & Barr, San Francisco, CA, for defendants Cutter Biological, Miles Inc., Miles Laboratories, Inc.

Stephen R. Thomas, Moffatt Thomas Barrett Rock & Fields, Boise, ID, Douglas F. Fuson, Sara J. Gourley, Sidley & Austin, Chicago, IL, for defendant Armour Pharmaceutical Corp.

## MEMORANDUM OPINION

RYAN, Senior District Judge.

### I.  FACTS AND PROCEDURE

Plaintiff John Doe is a hemophiliac. Because of his condition, John Doe received a clotting agent known as Factor VIII which facilitates the clotting of blood in hemophiliacs. In December of 1991, John Doe tested positive for the HIV virus.

On October 30, 1992, John Doe[1] commenced this federal action naming those providers of Factor VIII products which were administered to him by the Pocatello Regional Medical Center between 1979 and 1985. At this juncture, the named defendants include: Miles Inc. (Miles), and Armour Pharmaceutical Corporation (Armour).

In February of this year, after ruling upon a number of matters in this proceeding and after consulting with counsel herein, this court respectfully requested the Idaho Supreme Court to exercise its discretionary authority under Idaho Appellate Rule 12.1(c) to accept and decide the following questions:

(A) Assuming plaintiff is able to prove that more than one defendant breached a duty of care to the plaintiff, would Idaho allow recovery when it is not possible for plaintiff to prove which defendant caused

---

1. Pursuant to an Order Dismissing Frank and Jane Doe, filed on February 24, 1994, John Doe's parents were dismissed from this action. Accordingly, all references herein shall be made solely to Plaintiff John Doe.

plaintiff's injury; and, if so, under what theory?

(B) Does Idaho's blood shield statute, Idaho Code § 39–3702, preclude Plaintiff John Doe from alleging claims based on strict liability or implied warranties of merchantability and fitness for a particular purpose against the named defendants?

Order of Certification, filed Feb. 17, 1994, at 10.

Guided by decisions of the Ninth Circuit Court of Appeals, including *Smith v. Cutter Biological, Inc.*, 911 F.2d 374, 376 (9th Cir. 1990), and *Doe v. Cutter Biological, Inc.*, 971 F.2d 375 (9th Cir.1992), the issuance of an Order of Certification seemed unavoidable and entirely appropriate to this court. Nevertheless, on March 17, 1994, much to this court's dismay, an Order Declining to Accept Certification was entered by the Idaho Supreme Court and filed herein on March 23, 1994.

Accordingly, on April 28, 1994, this court held a hearing on the issues previously certified to the Idaho Supreme Court. Now, having fully considered the written record, together with the oral arguments of counsel, this court shall address the viability of alternative theories of liability under Idaho law, as well as the application of Idaho's blood shield statute.

## II. THE VIABILITY OF ALTERNATIVE THEORIES OF LIABILITY UNDER EXISTING IDAHO LAW

### A. *Plaintiff's Arguments*

■ According to plaintiff, the "evidence will show that [the named defendants] are the only companies who processed the Factor VIII infused by [him]." Mem.Supp. of Mot. for Partial Summ.J. & Mot. in Limine, filed Aug. 3, 1993, at 2. Plaintiff anticipates, however, that "at trial it will be difficult, if not impossible, to determine which of the Defendants processed the Factor VIII which caused [him] to be stricken with AIDS." *Id.* Therefore, plaintiff filed a motion asking this court to determine that, "one or more of the following alternative theories of liability are

applicable to the question of causation in this case: (a) Alternative liability, Section 433B(3), Restatement (Second) of Torts; (b) Market share liability; (c) Enterprise liability; and/or (d) Concert of action, Section 876 of the Restatement (Second) of Torts." Mot. for Partial Summ.J. & Mot. in Limine, filed Aug. 3, 1993, at 1–2.

Plaintiff acknowledges that Idaho has yet to be confronted with this kind of situation, but urges this court to conclude that, if presented with the facts in this case, Idaho's highest court would adopt at least one of the foregoing theories of alternative liability. In support of this position, plaintiff notes the decision of *Hackworth v. Davis*, 87 Idaho 98, 390 P.2d 422 (1964), wherein the Idaho Supreme Court cited the case of *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948), which was the first case to utilize the concept of alternative liability.[2]

### B. *Defendants' Arguments*

Based on traditional theories of causation under Idaho law and John Doe's admitted inability to prove which dose of Factor VIII caused him to contract the HIV virus and, ultimately, to develop AIDS, defendants filed motions for summary judgment as to the issue of causation. Defendants urge this court to foreclose plaintiff from recovering based on his negligence claims.

In support of their position, defendants note the absence of judicial decisions on the issue of alternative liability and, from a legislative standpoint, emphasize the advent of tort reform, the limitations placed on the common law doctrine of joint and several liability under Idaho Code §§ 6–803(3)–(7), and the provisions of Idaho's blood shield statute under Idaho Code § 39–3702.

Defendants contend that because *Hackworth v. Davis*, *supra*, "was decided over two decades before the Idaho legislature decided to eliminate joint and several liability ... [t]he continuing vitality of *Hackworth* is thus in doubt; particularly so since there have been no recent pronouncements on this issue by the Idaho Supreme Court." Armour's Supplemental Mem. Opp'n to Pl.'s Mot. for

---

**2.** *Summers v. Tice* is discussed in detail under subsection II.C of this opinion.

Partial Summ. J. & In Limine, filed Dec. 1, 1993, at 3. Defendants argue further that, even if alternative theories of liability were consistent with existing Idaho law, based on circumstances present in this case, none of the theories should be applied.

## C. This Court's Analysis of Alternative Theories of Liability

### 1. The original theory of alternate liability.

As stated earlier, the concept of alternate liability was first developed in the case of *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948). In *Summers*, the plaintiff was injured while hunting quail with the two defendants. Both defendants carried identical shotguns and ammunition. During the hunt, defendants shot simultaneously at the same bird, and plaintiff was struck by bird shot from one of the defendants' guns. Both defendants were found to have acted negligently, but it could not be determined which of them had fired the shot that injured the plaintiff. The California court held that the burden of proof should be shifted to the defendants on the issue of causation. *Id.* 199 P.2d at 4. In justifying such a shift, the court said that the defendants were "both wrongdoers—both negligent toward plaintiff. They brought about a situation where the negligence of one of them injured the plaintiff, hence it should rest with them each to absolve himself if he can." *Id.*

In the absence of any direct pronouncement by the Idaho Supreme Court on the issue of alternate liability, plaintiff relies heavily on the decision of *Hackworth*, wherein the Idaho Supreme Court included the *Summers* case in a string of citations. *See Hackworth v. Davis*, 87 Idaho at 105, 390 P.2d at 426. From this, plaintiff contends that the Idaho Supreme Court would find "one or more of the following alternative theories of liability ... applicable to the question of causation in this case: (a) Alternative liability, Section 433B(3), Restatement (Second) of Torts; (b) Market share liability; (c) Enterprise liability; and/or (d) Concert of action, Section 876 of the Restatement (Second) of Torts." Mot. for Partial Summ.J. & Mot. in Limine, filed Aug. 3, 1993, at 1–2.

Mere citation to *Summers* certainly does not compel the conclusion that the Idaho Supreme Court would adopt *any* theory of alternative liability. And, had the Idaho Supreme Court expressly adopted the holding from *Summers* in a case where a plaintiff was unable to prove which of two or more negligent defendants caused his injury, such would not compel the conclusion that any or all of the alternative theories of liability should be applied to the suppliers of the Factor VIII concentrates in this case.

On the contrary, unlike the defendants in *Summers*, Miles and Armour point out that their actions in providing Factor VIII concentrates to the plaintiff were not identical and that such actions were certainly not simultaneous in time. Also, when it comes to determining which dose of Factor VIII caused plaintiff's infliction with the HIV virus, Miles and Armour contend that they have no better access to information—which would assist in that determination—than the plaintiff.

In Idaho, and under the circumstances herein, this court finds the viability of the theory of alternate liability originated in *Summers* to be questionable.[3] At this point, however, before addressing relevant statutes and providing further analysis relative to the original theory, the court finds it useful to discuss each of the other three theories of alternative liability advanced by the plaintiff.

### 2. Market share theory.

The concept of market share liability was first developed by the California Supreme

---

**3.** The holding in *Summers* was subsequently codified in the Restatement (Second) of Torts § 433B(3) (1965), but Section 433B(3) of the Restatement (Second) of Torts has not been adopted in Idaho. When it comes to adopting sections of the Restatement, the Idaho Supreme Court "has consistently displayed its preference for selectively examining various sections and comments from the Restatement, and thereafter adopting, citing favorably, or rejecting the provision, as the occasion warrants." *Diamond v. Farmers Group, Inc.*, 119 Idaho 146, 149, 804 P.2d 319, 322 (1990) (citations omitted). Given the "preference" for selectively examining provisions of the Restatement, in the absence of any examination of Section 433B(3), it is hard to say whether Idaho would adopt Section 433B(3) under the circumstances presented by this case.

Court in *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980), to address unique causation problems raised by diethylstilbesterol (DES) litigation. In *Sindell,* the plaintiff alleged that she was injured by DES which her mother ingested while pregnant with the plaintiff. Although the plaintiff could not identify the manufacturer responsible for making the DES taken by her mother, the court held that if the plaintiff joined the manufacturers of a substantial share of the DES that her mother might have taken, the burden of proof would shift to the defendants to prove that they could not have supplied the DES which caused the plaintiff's injuries. The court ruled further that each defendant failing to make such a showing would be held liable for the proportion of the judgment represented by its share of the drug market.

In *Sindell,* to support application of the market share theory of liability, the California Supreme Court emphasized two factors— neither of which apply in the case at bar.

First, the court determined that DES was fungible or interchangeable because all DES companies produced the drug from an identical formula. In fact, DES was usually manufactured as a "generic" drug without regard to the actual manufacturer. Thus, each DES manufacturer's product posed the same risk of harm to its users.

Factor VIII concentrates are not akin to DES. On the contrary, as summarized in another proceeding:

> Unlike DES, Factor VIII is not a generic, fungible drug. Each processor prepares its Factor VIII concentrate by its own proprietary processes using plasma collected from its own sources. Each firm's Factor VIII concentrate is clearly distinguishable by brand name, package color, lot number, and number of units of Factor VIII per vial; each firm's Factor VIII concentrate is separately licensed by the Food and Drug Administration. There is no evidence that all Factor VIII products caused or were equally capable of causing HIV infection. Thus, *the risk posed by the different brands of Factor VIII is not identical.*

*Smith v. Cutter Biological, Inc.,* 72 Haw. 416, 823 P.2d 717, 733 (1991) (Moon, J., dissenting).

In other words, one of the bases for the *Sindell* court applying the market share theory of liability was that *each* DES pill was inherently dangerous and potentially harmful, whereas, in this case, it cannot be said that the Factor VIII concentrates at issue were inherently harmful. Rather, such concentrates would only have been harmful if particular plasma donors had been infected with the HIV virus.

The second factor which contributed to the *Sindell* court's application of the market share theory of liability was that the DES product could not be traced to any specific producer. *Sindell v. Abbott Laboratories,* 607 P.2d at 936. Unlike DES, however, with Factor VIII, it would have been possible— had plaintiff kept such records—to identify the source and lot number for each dose of Factor VIII used by the plaintiff and provided by Defendant Miles, as opposed to Defendant Armour.

In summary, while the market share theory of liability may have been appropriate to apply in the context of DES litigation,[4] *even if* the Idaho Supreme Court had ever sanctioned the use of such a theory—and it has not—it is not clear that the market share theory should be applied in the context of Factor VIII litigation.[5] *See Poole v. Alpha*

---

4. *But see* David M. Schultz, *Market Share Liability in DES Cases: The Unwarranted Erosion of Causation in Fact,* 40 DePaul L.Rev. 771 (1991) (concludes market share liability deviates too greatly from the principle of "causation in fact" and, therefore, legislatures, and not courts, are the appropriate forum for determining whether to adopt or reject market share liability).

5. Plaintiff notes the decision of *Earl v. Cryovac,* 115 Idaho 1087, 772 P.2d 725 (Ct.App.1989),

wherein the Idaho Court of Appeals cited the case of *Sindell v. Abbott Laboratories* in a footnote. *Id.* at 1089 n. 1, 772 P.2d at 728 n. 1. Citation to *Sindell* does not make market share liability a viable theory in Idaho. Indeed, in the text of the same decision the Court of Appeals discussed the requirement of proximate cause and noted that it "avoids compelling a defendant to pay damages when his connection with the plaintiff's injury is nothing more than a mere possibility." *Id.*

*Therapeutic Corp.,* 696 F.Supp. 351, 353–354 (N.D.Ill.1988) (rejecting the application of market share liability in case involving manufacturers of Factor VIII). *But see Smith v. Cutter Biological, Inc.,* 823 P.2d at 727–29 (adopting the market share theory of liability for the State of Hawaii in a case involving manufacturers of Factor VIII).

### 3. *Enterprise theory of liability.*

As summarized by the New York Court of Appeals:

> "Enterprise liability," *also joint and several,* derives from the opinion in *Hall v. DuPont de Nemours & Co.,* 345 F.Supp. 353 (E.D.N.Y.1972). In that case, plaintiffs were unable to identify the manufacturers of allegedly unsafe blasting caps for the simple reason that the caps had been obliterated by explosion. Since the six defendants in that case did, however, comprise virtually the entire American blasting cap industry and since it appeared that their blasting caps were *manufactured to meet industry-wide safety standards set by their own trade association,* the court held that *defendants could be liable for the joint control of the risk of accidental explosion.*

*Bichler v. Eli Lilly & Co.,* 55 N.Y.2d 571, 450 N.Y.S.2d 776, 780 n. 5, 436 N.E.2d 182, 186 n. 5 (1982) (emphasis added).

This court is not aware of any case in which the enterprise theory has been applied to manufacturers of Factor VIII concentrates. Indeed, even as it adopted the market share theory of liability and acknowledged that it was "writing a new chapter in tort law in the State of Hawaii," the Supreme Court of Hawaii rejected the enterprise theory, stating:

> [W]e mention the distinguishable characteristic of *Hall,* which is convincingly pointed out to us by appellees and the court in *Sindell v. Abbott Laboratories....* The court there noted that "the drug industry is closely regulated by the Food and Drug Administration [FDA] ... [t]o a considerable degree, therefore, the standards followed by drug manufacturers are suggested or compelled by the government." ... With the government in control of the ... actions [of the producers of

> Factor VIII concentrates], it is unfair to hold them liable for following the standards.

*Smith v. Cutter Biological, Inc.,* 823 P.2d at 727 (citations omitted).

This court agrees. Unlike members of the blasting caps industry in *Hall* who were found to have exercised joint control of the risks involved in that case, the actions of Miles and Armour in producing Factor VIII concentrates were closely controlled and/or regulated by the FDA. Moreover, as will be discussed below, the "joint and several" nature of the enterprise theory of liability compels the conclusion that Idaho courts would not adopt it. *See* Idaho Code § 6–803(3) (1990).

### 4. *Concert of action theory.*

"[T]he concert of action theory derives from a criminal law concept, aiding and abetting, and renders *jointly and severally* liable all who intentionally participate in an unlawful activity...." *Starling v. Seaboard Coast Line R.R. Co.,* 533 F.Supp. 183, 187 (S.D.Ga. 1982) (quoting *Ryan v. Eli Lilly & Co.,* 514 F.Supp. 1004, 1015 (D.S.C.1981)) (emphasis added). *See* Restatement (Second) of Torts § 876 (1977). The Supreme Court of Hawaii also rejected application of this theory, as it recognized that: "Inherent in this theory is the application of joint and several liability.... 'If plaintiffs can establish that all defendants acted tortiously pursuant to a common design, they will all be held liable for the entire result.'" *Smith v. Cutter Biological, Inc.,* 823 P.2d at 726 (citation omitted).

Again, as will be discussed below, Idaho Code § 6–803(3) essentially abolished joint and several liability in Idaho. Thus, it does not appear that the concert of action theory of alternative liability would be viable in Idaho. Moreover, given the express wording of Idaho's blood shield statute, Idaho Code § 39–3702, it does not appear that this theory of liability could be applied to providers of Factor VIII concentrates, such as Miles and Armour.

Miles and Armour's arguments in support of rejecting each of the foregoing theories of alternative liability are persuasive. But what

this court finds to be most persuasive are pronouncements of public policy made by Idaho's legislature in statutes with direct relevance to this action. Given the plain language of at least two Idaho statutes which operate to foreclose plaintiffs from recovery if they cannot prove which defendant caused their injury, the viability of any of the alternative theories of liability seems doubtful. Each statute shall be addressed in turn.

### D. Relevant Idaho Statutes

#### 1. Idaho Code § 6–803(3) limits the application of joint and several liability.

Prior to 1987, Idaho's Supreme Court adhered to the common law rule of joint and several liability, as it recognized:

> [E]ach tortfeasor whose negligence is a proximate cause of an *indivisible* injury should remain individually liable for *all* compensable damages attributable to that injury. Such is the underlying basis for the rule of joint and several liability.

> This Court has long held that when tortious acts of several parties concurrently cause an injury, each tortfeasor is liable for the whole of the damage.

*Tucker v. Union Oil Co.*, 100 Idaho 590, 600, 603 P.2d 156, 166 (1979) (first emphasis added) (citations omitted). And, relying upon the foregoing recognition of the "basis" for joint and several liability, it was expressly noted that the decision of *Hackworth v. Davis*, 87 Idaho 98, 390 P.2d 422 (1964), is "sound authority from this Court for the same principle." *Shields v. Martin*, 109 Idaho 132, 136, 706 P.2d 21, 25 (1985).

Taken by themselves, these judicial statements certainly support the vitality of the decision in *Hackworth v. Davis*, which cited but did not adopt the holding from *Summers v. Tice*, *supra*, and may *even* be construed to support the adoption of one of the four theories of alternative liability advanced by the plaintiff. However, in 1987, the Idaho legislature enacted Idaho Code § 6–803(3), which limited the doctrine of joint and several liability, and thereby *superseded all previous Idaho court decisions*. Section 6–803(3) provides as follows:

> The common law doctrine of joint and several liability is hereby limited to causes of action listed in subsections (5), (6) and (7) of this section. In any action in which the trier of fact attributes the percentage of negligence or comparative responsibility to persons listed in a special verdict, the court shall enter a separate judgment against each party whose negligence or comparative responsibility exceeds the negligence or comparative responsibility attributed to the person recovering. The negligence or comparative responsibility of each such party is to be compared individually to the negligence or comparative responsibility of the person recovering. Judgment against each such party shall be entered in an amount equal to each party's proportionate share of the total damages awarded.

Idaho Code § 6–803 (1990).

In subsections (5), (6), and (7) of the statute, Idaho Code § 6–803 does permit joint and several liability as to the following causes of action:

> (5) A party shall be jointly and severally liable for the fault of another person or entity or for payment of the proportionate share of another party where they were acting in concert or when a person was acting as an agent or servant of another party. As used in this section, "acting in concert" means pursuing a common plan or design which results in the commission of an intentional or reckless tortious act.

> (6) Any cause of action arising out of a violation of any state or federal law or regulation relating to hazardous or toxic waste or substances or solid waste disposal sites.

> (7) Any cause of action arising from the manufacture of any medical devices or pharmaceutical products.

Idaho Code § 6–803(5), (6) & (7) (1990). The applicability of each subsection shall be addressed in turn.

With respect to subsection (5), plaintiff's counsel argues that this subsection permits Miles and Armour to be held jointly and severally liable. The court does not find merit in such an argument. On the contrary, numerous undisputed facts in the record lead

this court to conclude that, *as a matter of law,* defendants were not acting in concert or as agents of one another. Nor can the conduct of these producers of Factor VIII be said to have constituted "a common plan or design which [resulted] in the commission of an intentional or reckless tortious act."

Certainly, subsection (6) does not apply to this case. And, finally, to the extent plaintiff's counsel argues that subsection (7) allows Miles and Armour to be held jointly and severally liable because they manufacture pharmaceutical products, such an argument ignores the provisions of Idaho's blood shield statute, Idaho Code § 39–3702, which declares the provision of products such as Factor VIII to be the rendering of a "service." [6] Thus, although defendants do engage in the manufacture of pharmaceutical products, provision of the product at issue in this case, i.e., Factor VIII, clearly falls under the auspices of Idaho's blood shield statute and is therefore deemed to constitute a "service." [7]

### 2. *Idaho Code § 39–3702 holds defendants accountable for their "own" negligence only.*

Idaho Code § 39–3702 and blood shield statutes, in general, will be discussed in detail in Section III of this memorandum. Also, in Section III, the court will address plaintiff's contention that Idaho Code § 39–3702 does not apply to Miles or Armour. However, assuming arguendo that Idaho Code § 39–3702 does apply to the named providers of the Factor VIII at issue in this case, it becomes useful to set forth the text of the statute at this point.

39–3702. Exclusion or modification of warranties on anatomical tissue, organ, fluid donation services.—The procurement, processing, storage, distribution, or use of whole blood, plasma, blood products, blood derivatives, bodily tissue, tissue products, organs, parts of organs or products de-

rived therefrom for the purpose of injecting, transfusing or transplanting the same, or any of them, into the human body for any purpose whatsoever is declared to be the rendering of a service by *any* person or *entity* (except a paid blood, organ or tissue donor, or a blood, organ or tissue bank operated for profit) participating therein and does not constitute a sale, whether or not any consideration is given therefor, and the implied warranties of merchantability and fitness for a particular purpose shall not be applicable as to a defect that cannot be detected or removed by reasonable use of standard established scientific procedures or techniques, except such person or entity shall remain liable for his or its *own negligence or willful misconduct only.*

Idaho Code § 39–3702 (1993) (emphasis added).

Given the nature of this case, the plain language of Idaho's statute sheds light on the plausibility of adopting the alternative liability theories advanced by the plaintiff. Indeed, with respect to a negligence action against any entity processing or distributing "blood products" or "blood derivatives," the Idaho legislature expressly states that such an entity shall "remain liable for his or its *own negligence* or willful misconduct *only.*"

Similar language is present in Hawaii's blood shield statute. *See* Haw.Rev.Stat. § 327–51 (1985). Despite such language, however, in *Smith v. Cutter Biological, Inc.,* 823 P.2d 717 (Hawaii 1991), the Hawaii Supreme Court answered questions certified by the Ninth Circuit Court of Appeals and concluded that Hawaii's statute precludes a strict liability action against the manufacturers of Factor VIII blood products, but does *not* preclude a negligence action based on the theory of "market share" liability.

---

**6.** In pertinent part, Idaho's blood shield statute states that:

The *procurement, processing,* storage, *distribution,* or use of whole blood, plasma, *blood products, blood derivatives,* bodily tissue, tissue products, organs, parts of organs *or products derived therefrom for the purpose of injecting,* transfusing or transplanting the same, or any of them, into the human body *for any purpose*

*whatsoever is declared to be the rendering of a service by any person or entity....*
Idaho Code § 39–3702 (1993) (emphasis added).

**7.** Moreover, in 1980 the Idaho legislature passed the Product Liability Reform Act, Idaho Code §§ 6–1401, *et seq.* (1990). In its definition of a "product," the legislature expressly excluded "human blood and its components." Idaho Code § 6–1402(3) (1990).

Arguably, the Hawaii Supreme Court was vested with authority to alter or modify the existing law of the State of Hawaii despite statutory language to the contrary. For a federal court exercising diversity jurisdiction in the District of Idaho, the majority decision reached by the Hawaii court is of little consequence. Nevertheless, the decision reached in Hawaii sheds light on the case before this court. The light comes from the well written dissent. *See Smith v. Cutter Biological, Inc.,* 823 P.2d at 729–38 (Moon, J., concurring and dissenting).

Vigorously challenging the majority's endorsement of the market share theory of liability in Hawaii, the dissent states that the decision is,

> contrary to established rules of statutory construction and contravenes the intent of the Hawaii legislature in enacting Hawaii's blood shield statute. The policy considerations which underlie our blood shield law preclude the adoption of a negligence theory that abandons the fundamental principle of causation and shifts the burden to defendants to exonerate themselves.

*Id.* at 730. Moreover, pointing to language which is similar to that contained in the closing phrases of Idaho's blood shield statute, the dissent contends that:

> The statute is plain and unambiguous. It protects manufacturers of blood products from all liability, with one exception: "save and except that each ... entity shall remain liable for ... its *own negligence* ..." (emphasis added). In other words, the statute requires proof of all elements of a negligence action, including causation.

*Id.* 823 P.2d at 730 (construing Haw.Rev. Stat. § 327–51 (1985)). Despite sympathy felt for the innocent plaintiffs, the dissent sets forth sound reasons for exercising judicial restraint, for adhering to the traditional rules of causation, and for observing the public policy established by the Hawaii legislature. Such reasoning is equally sound in view of Idaho's blood shield statute and the circumstances presented in the case at bar.

### E. Conclusion Re: Alternative Liability Theories

Rather than initially relying on Idaho Code § 6–803(3) and/or the plain wording of Idaho's blood shield statute, Idaho Code § 39–3702, and foreclosing plaintiff from recovering on his negligence claims, out of compassion for John Doe and other similarly situated hemophiliacs and because this court found the issues presented herein to be important to the development of Idaho law, an Order of Certification was issued to the Idaho Supreme Court. Yet, despite the recent opportunity to · directly address the viability of alternative liability theories to the causation issue raised in this type of case, the Idaho Supreme Court declined to do so.

Such a declination leads this court to infer that the highest court of the State of Idaho found that Idaho's tort law cannot or should not be expanded. At the very least, such an inference is based on the express abolition of joint and several liability under Idaho Code § 6–803(3) and/or the plain wording of Idaho's blood shield statute, Idaho Code § 39–3702.

Whether in the context of innocent hemophiliacs becoming infected with the deadly HIV virus, or in any other context, it cannot be said that the Idaho Supreme Court would join some nationwide trend to adopt alternative liability. Put simply, it cannot be said that such a trend exists.

Indeed, state by state, it is difficult to assess the status of the alternative liability concept first set forth in *Summers v. Tice.*[8] Apparently, some states have clearly accepted theories of alternative liability,[9] several states have specifically rejected theories of alternative liability,[10] and the majority of states have found its application to be unwarranted in the specific cases where it was offered.[11] Hence, even if this court were vested with the authority to engage in such

---

**8.** Richard Carl Schoenstein, Note, *Standards of Conduct, Multiple Defendants, and Full Recovery of Damages in Tort Liability for the Transmission of Human Immunodeficiency Virus,* 18 Hofstra L.Rev. 37, 64 (1989).

**9.** *Id.* n. 144.

**10.** *Id.* n. 145.

**11.** *Id.* n. 146.

prognostication, this court could not, with any certainty, predict that the Idaho Supreme Court would adopt any theory of alternative liability proposed by the plaintiff.

Moreover, the express legislative limitation placed on joint and several liability in Idaho substantially undermines plaintiff's arguments which ask this court to conclude that Idaho courts would permit plaintiff to pursue his negligence claims based on alternative theories of liability. It is readily acknowledged that the concept of joint and several liability underlies the concept of alternative liability delineated in *Summers.*

Even in Idaho, subsequent to the decision of *Hackworth v. Davis, supra,* in *Petersen v. Parry,* 92 Idaho 647, 448 P.2d 653 (1968), a dissenting opinion issued by members of the Idaho Supreme Court once again discussed, but did not adopt, the holding in *Summers.* The dissent is noteworthy to the extent that it recognized "the basic theory" of alternative liability proclaimed in *Summers* "is that where the negligence of two or more persons combined in causing a single, indivisible injury to a third person, then all the tort feasors are *jointly and severally liable* for the injury produced." *Petersen v. Parry,* 92 Idaho at 653, 448 P.2d at 659 (emphasis added).

Thus, given the recognition that the theory of alternative liability set forth in *Summers v. Tice* involves joint and several liability, and given that the Idaho Supreme Court fully acknowledges that the Idaho legislature abolished joint and several liability when it enacted Idaho Code § 6–803(3),[12] existing Idaho law precludes the endorsement of alternative liability theories.

In addition to the operation of Idaho Code § 6–803(3), which limits the operation of joint and several liability in Idaho, the plain language of Idaho's blood shield statute expressly precludes providers of "blood products" or "blood derivatives" from being held liable for anything other than their own negligence. In the face of this clear statement of public policy by Idaho's legislature, it is difficult to imagine how any theory of alternative liability could be endorsed in this type of case.

■ Therefore, in light of the express wording of relevant Idaho statutes, including Idaho Code §§ 6–803(3) and 39–3702, together with repeated judicial affirmations of the elements requisite to every negligence action[13]—and, most recently, given the Idaho Supreme Court's disinclination to address the issues certified herein—based on *existing* Idaho law, this court concludes that John Doe is required to prove whether Miles and/or Armour caused his injury.

Because plaintiff concedes that "at trial it will be difficult, if not impossible, to determine which of the Defendants processed the Factor VIII which caused [him] to be stricken with AIDS," defendants' motions for summary judgment on the issue of causation are well taken and must be granted.[14]

---

**12.** *See Bantz v. Mutual of Enumclaw Ins. Co.,* 124 Idaho 780, 784 n. 3, 864 P.2d 618, 622 n. 3 (1993).

**13.** Under Idaho law, the elements of an action based on negligence are: (1) a duty, recognized by law, requiring a defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) *a causal connection between the defendant's conduct and the resulting injuries;* and (4) actual loss or damage. *Eliopulos v. Knox;* 123 Idaho 400, 408, 848 P.2d 984, 992 (1992); *Fuller v. Studer,* 122 Idaho 251, 253, 833 P.2d 109, 111 (1992); *Black Canyon Racquetball Club, Inc. v. Idaho First Nat'l Bank,* 119 Idaho 171, 175–76, 804 P.2d 900, 904–905 (1991); *Slade v. Smith's Management Corp.,* 119 Idaho 482, 487, 808 P.2d 401, 406 (1991); *Alegria v. Payonk,* 101 Idaho 617, 619, 619 P.2d 135, 137 (1980); *Brizendine v. Nampa Meridian Irrigation Dist.,* 97 Idaho 580, 583, 548 P.2d 80, 83 (1976).

**14.** Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Ninth Circuit Court of Appeals has acknowledged that in recent years, the Supreme Court, "by clarifying what the non-moving party must do to withstand a motion for summary judgment, has increased the utility of summary judgment." *California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988). As the Ninth Circuit has expressly stated: "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id.*

## III. THE ROLE OF IDAHO'S BLOOD SHIELD STATUTE

### A. General Background of the Statute

■ Based on public policy considerations, in *Perlmutter v. Beth David Hospital*, 308 N.Y. 100, 123 N.E.2d 792 (1954), the New York Court of Appeals was first to conclude that the distribution of blood constituted a "service" and not a sale. *Id.* at 794. This holding precluded a plaintiff who contracted hepatitis from a contaminated blood transfusion, from recovering on breach of warranty claims. Subsequently, 48 states codified the *Perlmutter* holding in what have come to be known as "blood shield statutes."[15] In addition to precluding recovery based on implied warranties, blood shield statutes also preclude actions based on strict liability in tort.[16]

Originally enacted in 1971, and amended in 1986, Idaho's "blood shield statute" provides as follows:

39-3702. Exclusion or modification of warranties on anatomical tissue, organ, fluid donation services.—The procurement, processing, storage, distribution, or use of whole blood, plasma, blood products, blood derivatives, bodily tissue, tissue products, organs, parts of organs or products derived therefrom for the purpose of injecting, transfusing or transplanting the same, or any of them, into the human body for any purpose whatsoever is declared to be the rendering of a service by *any person*

or entity (except a paid blood, organ or tissue donor, or a blood, organ or tissue bank operated for profit) participating therein and does not constitute a sale, whether or not any consideration is given therefor, and the implied warranties of merchantability and fitness for a particular purpose shall not be applicable as to a defect that cannot be detected or removed by reasonable use of standard established scientific procedures or techniques, except such person or entity shall remain liable for his or its own negligence or willful misconduct only.

Idaho Code § 39–3702 (1993) (emphasis added).[17]

Like the majority of blood shield statutes, Idaho's statute expressly declares the "procurement, processing, storage, distribution, or use of ... plasma, blood products [or] blood derivatives ... for the purpose of injecting, transfusing or transplanting the same ... into the human body for any purpose whatsoever ... to be the rendering of a *service* by any ... *entity* ... and does not constitute a *sale*, whether or not any consideration is given therefor...." *Id.* (emphasis added).

By characterizing such blood related transactions to be the "rendering of a service," as opposed to the sale of a product, there are no remedies available under the Uniform Com-

---

Indeed, in addressing the application of "The Summary Judgment Test," the Ninth Circuit has specifically explained that:

A "material" fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *The materiality of a fact is thus determined by the substantive law governing the claim or defense.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

*T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)) (emphasis added).

15. *See* Kathryn W. Pieplow, Comment, *Aids, Blood Banks and the Courts: The Legal Response to Transfusion–Acquired Disease*, 38 S.D.L.Rev. 609, 622–625, nn. 80–86 (1993) (article provides nationwide listing of blood shield statutes).

16. As one commentator recognized:

The "fundamental purpose underlying strict tort liability is to force hazardous products from the market." Conversely, blood and blood products are highly desirable medical products which cannot, with present scientific technology, be made completely safe. In recognition of the fact that blood [and blood products are] too essential ... to be forced from the market, legislatures have provided the blood industry some immunity from liability.

*Id.* at 622 (footnotes omitted).

17. The court is mindful that the text of this statute was already set forth under Section II of this Memorandum. Nevertheless, as this court construes Idaho Code § 39–3702 in relation to plaintiff's Motion in Limine for Ruling Regarding Pleading of Strict Liability or Motion for Leave to Amend Complaint, restatement of the entire statute is warranted.

mercial Code [18] and strict liability in tort does not apply.[19] Thus, the wording of Idaho's statute expressly precludes actions based on implied warranties; and impliedly precludes actions based on strict liability by stating: "such person[s] or entit[ies] shall remain liable for his or its own negligence or willful misconduct *only.*" Idaho Code § 39–3702.

### B. *Plaintiff's View of Idaho Code § 39–3702*

On November 15, 1993, plaintiff filed a Motion In Limine for Ruling Regarding Pleading of Strict Liability or Motion for Leave to Amend Complaint. Essentially, plaintiff asks this court to conclude that Idaho's blood shield statute does not apply to defendants and that, in addition to asserting a cause of action based on negligence, as presently written, his amended complaint is an "adequate foundation for submitting the issues of negligence, strict liability, and breach of warranties to the jury. . . ." Mot. in Limine for Ruling Re: Pleading of Strict Liability or Mot. for Leave to Amend Compl., filed Nov. 15, 1993, at 2.

In the alternative, plaintiff asks this court to order that: "The Blood Shield statute does not apply to the Defendants in this action and Plaintiff[ ] may have leave to amend [his] complaint to include the theories of strict liability and implied warranties of merchantability and fitness for a particular purpose." *Id.*

### C. *Defendants' View of Idaho Code § 39–3702*

In response to plaintiff's motion, Miles and Armour basically argue that plaintiff's proposed theories of liability are contrary to the plain language of Idaho Code § 39–3702, and therefore, plaintiff is precluded from alleging any theory of recovery other than one based on negligence. In addition, even if Section 39–3702 did not apply to Miles and Armour,

defendants take the position that plaintiff's complaint only alleges a cause of action based on negligence, and that, at this point in time, any amendment to the complaint would be prejudicial.

### D. *This Court's View of Idaho Code § 39–3702*

Resolution of the parties' dispute regarding the applicability or inapplicability of Idaho's blood shield statute rests on the interpretation and application of the parenthetical language contained therein. The statute "excepts" from its application "a paid blood, organ or tissue donor, or a blood, organ or tissue bank operated for profit." Idaho Code § 39–3702. Thus, the question is: Do the defendants fall within the exception or not?

To date, no aspect of Idaho's blood shield statute has been construed by the Idaho Supreme Court. When presented with an opportunity to construe this statute, the Idaho Supreme Court declined to do so. *See* Order Declining to Accept Certification, filed Mar. 23, 1994. Thus, since this court is faced with the task of construing this statute for the first time, as it does so, it will rely on the rules of statutory construction followed by Idaho's highest court.

In *Rim View Trout Co. v. Higginson,* 121 Idaho 819, 828 P.2d 848 (1992), the Idaho Supreme Court set forth a detailed analysis of the rules governing statutory interpretation.

It is a basic rule of statutory construction that, unless the result is palpably absurd, we must assume that the legislature means what is clearly stated in the statute. *Sherwood v. Carter,* 119 Idaho 246, 254, 805 P.2d 452, 460 (1991); *Miller v. State,* 110 Idaho 298, 715 P.2d 968 (1986); *State Dep't of Law Enforcement v. One 1955 Willys Jeep,* 100 Idaho 150, 595 P.2d 299 (1979). It is also well established that statutes must be interpreted to mean what the legislature intended the statute to mean,

---

**18.** Uniform Commercial Code § 2–314, which provides an implied warranty of merchantability, and U.C.C. § 2–315, which provides an implied warranty of fitness for a particular purpose, are both remedies for the sale of goods, as opposed to services. *See generally* U.C.C. Art. 2.

**19.** *See generally,* Restatement (Second) of Torts § 402A(1) (1965) (sellers of "products" subject to strict liability); *Shields v. Morton Chem. Co.,* 95 Idaho 674, 518 P.2d 857 (1974) (adopting Section 402A, Restatement (Second) of Torts).

*Sherwood v. Carter,* 119 Idaho 246, 254, 805 P.2d 452, 460 (1991); *Miller v. State,* 110 Idaho 298, 715 P.2d 968 (1986); *Carpenter v. Twin Falls County,* 107 Idaho 575, 691 P.2d 1190 (1984), and the statute must be construed as a whole. *Sherwood v. Carter,* 119 Idaho 246, 254, 805 P.2d 452, 460 (1991); *Leliefeld v. Johnson,* 104 Idaho 357, 659 P.2d 111 (1983); *Sherwood & Roberts Inc. v. Riplinger,* 103 Idaho 535, 650 P.2d 677 (1982). Statutory interpretation always begins with an examination of the literal words of the statute. *Local 1494 of the Int'l Ass'n of Firefighters v. City of Coeur d'Alene,* 99 Idaho 630, 586 P.2d 1346 (1978). In so doing, every word, clause and sentence should be given effect, if possible. *Wright v. Willer,* 111 Idaho 474, 725 P.2d 179 (1986); *University of Utah Hosp. & Medical Center v. Bethke,* 101 Idaho 245, 611 P.2d 1030 (1980). *The clearly expressed intent of the legislature must be given effect and there is no occasion for construction where the language of a statute is unambiguous. Sherwood v. Carter,* 119 Idaho 246, 254, 805 P.2d 452, 460 (1991); *Ottesen ex rel. Edwards v. Board of Comr's of Madison County,* 107 Idaho 1099, 695 P.2d 1238 (1985). Finally, when construing a statute, its words must be given their plain, usual and ordinary meaning. *Sherwood v. Carter,* 119 Idaho 246, 254, 805 P.2d 452, 460 (1991); *Walker v. Hensley Trucking,* 107 Idaho 572, 691 P.2d 1187 (1984).

*Id.* at 822–23, 828 P.2d at 852–53 (emphasis added).

Applying these rules of statutory construction to the plain, usual and ordinary meaning of the language contained within Idaho's blood shield statute, this court is compelled to conclude that Defendants Miles and Armour are "entities" shielded by the statute and that they are not excepted from the statute by language pertaining to a *"paid blood, organ or tissue donor, or a blood, organ or tissue bank operated for profit."*

Nothing within the extensive record before this court supports the conclusion that Miles and Armour are either "paid blood donors" or "blood banks operated for profit." The term "blood bank" has been defined as "[a] reserve supply of whole blood or plasma kept at a hospital or Red Cross Center under favorable storage conditions. The stock is obtained from suitable donors, and the material is expended as needed, especially in emergencies." 1 J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine and Word Finder* (1994).

Nothing in the record suggests that Miles and Armour are either hospitals or Red Cross Centers engaged in the business of storing blood or plasma to be expended in emergencies. Nor does anything in the record suggest that, like Miles and Armour, "blood banks" engage in processing and/or distributing Factor VIII concentrates.

Plaintiff emphasizes the fact that Miles and Armour "operate for profit." While this is true, this fact alone does not bring the defendants within the parenthetical exception to Idaho's blood shield statute. On the contrary, with respect to Factor VIII concentrates,[20] Miles and Armour appear to fall precisely within the provisions of Idaho Code § 39-3702.[21]

**20.** Defendant Miles states:

Factor VIII concentrates are derived from human blood using processes known as "plasmapheresis" and "fractionation." In plasmapheresis, whole blood is taken from a donor and spun in a centrifuge to separate the plasma from the red blood cells. The plasma is then collected, *and the red blood cells are returned to the donor.* Only plasma, the noncellular portion of blood, is actually taken from the donor. Thereafter, using fractionation, the plasma is further refined to produce a material known as "cryoprecipitate," which contains very concentrated amounts of Factor VIII. The Factor VIII is then extracted from the cryoprecipitate, sterile-filtered, placed into vi-

als, and freeze-dried. Each Defendant uses its own proprietary and FDA-licensed methods in preparing its Factor VIII concentrates.
Mem. of Law Opp'n to Pl.'s Mot. in Limine, filed Dec. 8, 1994, at 3.

**21.** As pointed out by Miles, in all likelihood, commercial blood banks operating in the early 70s prompted the inclusion of the "excepting language" in Idaho's blood shield statute. *See* Def.Miles' Mem. of Law Opp'n to Pl.'s Mot. In Limine, filed Dec. 8, 1993, at 8–10. However, unlike such commercial blood banks, processors and producers of Factor VIII concentrates are individually licensed and highly regulated by the FDA. *See* 21 C.F.R. Part 600, *et seq.* (1993).

Both defendants are involved in the "procurement, processing, storage, [and] distribution ... [of] blood products [and] blood derivatives ... for the purpose of injecting ... the same ... into the human body...." Idaho Code § 39–3702 (1993). And, based on the broad language of the statute, such efforts by Miles and Armour are,

> declared to be the rendering of a service ... [that] does not constitute a sale, whether or not any consideration is given therefor, and the implied warranties of merchantability and fitness for a particular purpose *shall not be applicable as to a defect that cannot be detected or removed by reasonable use of standard established scientific procedures or techniques,* except such person or entity shall remain liable for his or its own negligence or willful misconduct only.

*Id.* (emphasis added). Even if Miles and Armour are "entities" covered by the statute, plaintiff contends he should be able to assert a claim based on implied warranties of merchantability and fitness for a particular purpose. Plaintiff asserts that the HIV virus, which contaminated the Factor VIII concentrates, constituted a "defect" which defendants should have "detected or removed by reasonable use of standard established scientific procedures or techniques." At the very least, plaintiff argues that the "reasonableness" of the defendants' efforts presents a jury question. This court cannot agree.[22]

Based on a plethora of articles, affidavits, and deposition excerpts in the record, this court concludes that, *during the time period within which plaintiff was infected with HIV,* there were no "standard established scientific procedures or techniques" which would have detected or removed the HIV virus from Factor VIII concentrates.

Certainly, over time, the record demonstrates that the entire blood industry became increasingly aware of techniques for making blood and blood products more safe from the risk of HIV. Nevertheless, it was not until 1984 that the medical community reached a consensus that AIDS was transmissible by blood. James W. Curran, M.D., et al., *Acquired Immune Deficiency Syndrome (AIDS) Associated with Transfusions,* 310 New Eng.J.Med. 69, 70 (1984). And, it was not until March 2, 1985, that the FDA licensed the enzyme-linked immunosorbent assay (ELISA) test, which detects the presence of antibodies to HIV.[23] Aff. of Theodore A. Walters, M.D., filed Oct. 15, 1993, ¶ 4 at 3.

·As demonstrated by the record, in all likelihood, John Doe was infected with the HIV virus *prior to August of 1984,* which marked the time when the plaintiff began using heat-treated factor concentrate. *See* Aff. of John J. Burke, filed Oct. 15, 1993, Ex. 13 (excerpt from Jane Doe Depo. at 48). Heat treatment inactivates the HIV virus. Thus, during the time period within which John Doe was likely to have been infected by contaminated Factor VIII (i.e., prior to August 1984), nothing in the record establishes that the FDA had imposed any standards, scientific procedures or techniques which would have insured the safety of Factor VIII concentrates.

With the dramatic numbers of cases involving innocent victims of AIDS, state legislatures, including Idaho's, may choose to revisit and refine the scope of blood shield statutes.[24] Notwithstanding the possibility for change in Idaho's statute, as currently worded, and under the circumstances in this case, the Idaho blood shield statute does not permit an action based on strict liability or implied warranties against suppliers of Factor VIII concentrates such as Miles and Armour. Rather, against these defendants

22. *See* "The Summary Judgment Standard," *supra,* at note 13.

23. "An additional test for AIDS, called the 'Western Blot test' was licensed for use by the FDA in mid–1987. Thereafter, the Western Blot test became the standard confirmatory test." Walters Aff., filed Oct. 15, 1993, ¶ 5 at 3.

24. *See* Ross D. Eckert, *The AIDS Blood–Transfusion Cases: A Legal and Economic Analysis of Liability,* 29 San Diego L.Rev. 203 (1992) (Article acknowledges that 49 states exempt blood banks from strict liability and that the usual negligence rule is weak. Eckert argues that blood bankers have superior information for reducing risk and that stronger liability rules should be reconsidered); Jan M. Bennetts, Note, *Aids: Blood Bank Liability,* 27 Willamette L.Rev. 355, 379 (1991) (concludes, among other things, that maintaining an adequate blood supply and ensuring that blood is safe are not mutually exclusive goals).

Idaho Code § 39–3702 only permits actions based on negligence.

### E. Plaintiff's Motion to Amend

■ As a threshold matter, this court has concluded that Idaho's blood shield statute applies to Miles and Armour. Based on this finding, it would be an exercise of futility to allow plaintiff to amend his complaint to allege claims based on strict liability and/or breach of the implied warranties of merchantability and fitness for a particular purpose.

In *Roth v. Garcia Marquez*, 942 F.2d 617 (9th Cir.1991), the Ninth Circuit Court of Appeals acknowledged that "courts have discretion to deny leave to amend a complaint for 'futility,' and futility includes the inevitability of a claim's defeat on summary judgment." *Id.* at 628–29 (citation omitted); *see also Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 766 (9th Cir.1986) ("any amendment would have been futile in that it could be defeated on a motion for summary judgment").

The plain wording of Idaho's blood shield statute, together with an extensive record herein, leads this court to conclude that amendment of plaintiff's complaint would be futile.[25] In particular, pursuant to Idaho Code § 39–3702, claims based on strict liability and/or breach of the implied warranties of merchantability and fitness for a particular purpose would inevitably be defeated by a motion for summary judgment.[26]

## IV. CONCLUSION

As a federal court exercising jurisdiction over this case based on diversity of citizenship among the parties, it is the role of this court to apply, and not to make, Idaho law. Indeed, in the landmark case of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the Supreme Court held that:

> Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State. *And whether the law of the State shall be declared by its Legislature*

**25.** As one district court acknowledged:
   Hemophiliacs, like Doe, depend on the availability of Factor VIII Concentrate which has lengthened and improved the quality of their lives. Because the market for these products is small, [footnote omitted] their availability would be threatened if the cost of the inherent risk of HIV infection were imposed on the manufacturer. Therefore, despite the devastating consequences resulting from the transmission of HIV through products like Factor VIII Concentrate, virtually every court that has considered the question has interpreted blood shield statutes to apply to the commercial processors of antihemophilic factors.
   *Doe v. Travenol Laboratories, Inc.*, 698 F.Supp. 780, 784 (D.Minn.1988) (citations omitted).

**26.** Plaintiff asks this court to conclude that as presently written his amended complaint is an "adequate foundation for submitting the issues of negligence, strict liability, and breach of warranties to the jury. . . ." Mot. in Limine for Ruling Re: Pleading of Strict Liability or Mot. for Leave to Amend Compl., filed Nov. 15, 1993, at 2. Based on a finding that the blood shield statute applies to Miles and Armour, this request is essentially rendered moot. However, for purposes of clarifying this issue, the court finds that, as it now reads, Plaintiff's Second Amended Complaint appropriately states a cause of action based on negligence *only*.

Plaintiff's counsel contends that: "It is our understanding that pleadings in Idaho have to give notice of the basic facts of what the case is about and there is no requirement that every legal issue that might be presented to the jury must be set forth in the complaint." Br. Supp.Mot. in Limine for Ruling Re: Pleading of Strict Liability or Mot. for Leave to Amend Compl., filed Nov. 15, 1994, at 3. Such a contention ignores the provisions of Rule 8(a) of the Federal Rules of Civil Procedure. As pointed out by Armour, "[t]he fact that a party pleads *absolutely nothing* with respect to a liability theory does not put an opposing party on notice that they may at a later date, of their own choosing, add such a theory." Armour's Mem.Opp'n to Pl.'s Mot. in Limine Re: Pleading of Strict Liability or for Leave to Amend Compl., filed Dec. 8, 1993, at 4 n. 1.

Thus, had the court found Idaho's blood shield statute inapplicable to defendants, plaintiff would have been required to obtain leave to file a third amended complaint setting forth causes of action based on strict liability and/or ⏤reach of the implied warranties of merchantability and fitness for a particular purpose. Having concluded that plaintiff's motion to amend should be denied because such an amendment would be futile, this court need not address Miles' and Armour's arguments about whether such an amendment would have been prejudicial.

*in a statute or by its highest court in a decision is not a matter of federal concern.* Id. at 78, 58 S.Ct. at 822 (emphasis added).

Neither the Idaho legislature nor the highest court of this state has declared that, without proof of causation, a plaintiff, such as John Doe, should be able to recover against providers of Factor VIII concentrates, such as Miles and Armour. Accordingly, to avoid summary judgment on his negligence claims, plaintiff contends that this court "should *predict* which alternate theory of causation the Idaho Supreme Court would adopt in this case." Pl.'s Reply to Def.'s Opp'n to Mot. for Partial Summ.J. & Mot. in Limine, filed Nov. 15, 1993, I.A at 2 (emphasis added). This court is not empowered to make such a prediction.

Indeed, as it acknowledged the fundamental rule of federal diversity jurisdiction, the Ninth Circuit Court of Appeals recognized that federal courts apply *"existing"* state law, and *"do not predict* possible changes in that law." *Moore v. R.G. Indus., Inc.,* 789 F.2d 1326, 1327 (9th Cir.1986) (emphasis added) (*citing Klingebiel v. Lockheed Aircraft Corp.,* 494 F.2d 345, 346 (9th Cir.1974)).

Moreover, the District of Columbia Circuit Court of Appeals concluded that a plaintiff could not recover under "concert of action" or "market share" theories of liability based on the law of Maryland, as it acknowledged that:

> Absent some authoritative signal from the legislature or the [state courts], we see no basis for even considering the pros and cons of innovative theories.... We must apply the law of the forum as we infer it presently to be, not as it might come to be.... [W]e see no basis for applying any rule other than the traditional one.

*Tidler v. Eli Lilly & Co.,* 851 F.2d 418, 424 (D.C.Cir.1988) (*quoting Dayton v. Peck, Stow & Wilcox Co.,* 739 F.2d 690, 694–95 (1st Cir.1984)) (other citations omitted).

With the advent of tort reform and the Idaho legislature's virtual abolition of joint and several liability, this court is hard pressed to conclude that the public policy of Idaho supports an expansion of Idaho's traditional tort law. Moreover, when directly presented with an opportunity to engraft an exception on Idaho's long standing rule requiring proof of causation, the Idaho Supreme Court declined to do so.

Plaintiff argues that "[i]n cases such as this one, justice requires modification of traditional causation rules, unless this Court finds that negligent/reckless manufacturers of product[s] who have caused a virtual genocide in the hemophilia population should escape liability for their conduct." Pl.'s Reply to Defs.' Opp'n to Mot. for Partial Summ.J. & Mot. in Limine, filed Nov. 15, 1993, at 3. This court certainly empathizes with plaintiff's situation. Notwithstanding such empathy, however, and whether this court finds that Idaho's causation requirement should be "modified" or not, in light of the legislative and judicial backdrop relevant to this case, and in the exercise of diversity jurisdiction, this court does not find itself "free to engraft" onto Idaho law those "exceptions or modifications which may commend themselves to [this court], but which have not commended themselves to the State [of Idaho]." *Day & Zimmermann, Inc. v. Challoner,* 423 U.S. 3, 4, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975).

From the Order Declining to Accept Certification, this court infers that the highest court of the State of Idaho either found that Idaho's tort law cannot *or* should not be expanded given the abolition of joint and several liability under Idaho Code § 6–803 and/or the express language of Idaho's blood shield statute under Idaho Code § 39–3702. And, given the Idaho Supreme Court's unwillingness to engage in an interpretation of the language contained in Idaho's Blood Shield statute, this court found the plain language of the statute to be controlling.

Accordingly, the questions previously certified to the Idaho Supreme Court are hereby answered as follows: (1) Based on *existing* Idaho law, assuming plaintiff is able to prove that more than one defendant breached a duty of care to the plaintiff, Idaho would not allow recovery when it is not possible for plaintiff to prove which defendant caused his injury; and (2) based on the *plain language* of Idaho's blood shield statute, Idaho Code § 39–3702, Plaintiff John Doe is precluded

from alleging claims based on strict liability or implied warranties of merchantability and fitness for a particular purpose against the named defendants.

Thus, it is this court's conclusion that plaintiff's motion for partial summary judgment requesting the adoption of one or more alternative liability theories should be denied; that defendants' motions for summary judgment on the issue of causation should be granted; and that plaintiff's attempt to assert products liability claims based on strict liability or implied warranties of merchantability and fitness for a particular purpose should be denied.

## V. ORDER

Based on the foregoing and the court being fully advised in the premises,

IT IS HEREBY ORDERED that Plaintiff's Motion for Partial Summary Judgment and Motion in Limine, filed August 3, 1993, should be, and is hereby, DENIED.

IT IS FURTHER ORDERED that Defendant Miles' Motion for Summary Judgment, filed October 15, 1993, and Defendant Armour's Motion for Summary Judgment, filed October 18, 1993, with respect to the issue of causation should be, and are hereby, GRANTED. Because plaintiff cannot establish which defendant caused his injury, existing Idaho law does not allow recovery and, therefore, plaintiff's Second Amended Complaint filed February 17, 1994, should be, and is hereby, DISMISSED.

IT IS FURTHER ORDERED that plaintiff's Motion in Limine for Ruling Regarding Pleading of Strict Liability [and/or] Motion for Leave to Amend Complaint, filed November 15, 1993, should be, and are hereby, DENIED.

IT IS FURTHER ORDERED that the jury trial set on November 7, 1994, in Boise, Idaho, should be, and is hereby, VACATED.